Irving H. Saypol, J.
These three companion test cases, presenting common questions of fact and law, on stipulation and order were tried together to the court. Although the amounts sought are nominal, altogether only $303 for the three actions, decision may affect innumerable hospital, medical school and physician-patient relationships and substantial sums. Determination of important questions of first impression whose solution has little, if any, guiding precedent is involved.
Plaintiffs are duly licensed physicians. They are professors of medicine, full-time salaried teachers on the faculty of Yeshiva University’s Altjert Einstein College of Medicine (herein “College ”). The College and Bronx Municipal Hospital Center (herein BMHC) are affiliated. By an agreement between the City of New York and Yeshiva University, the visiting staff of the BMHC is drawn exclusively from the faculty of the College. As visiting staff members of the city facility they serve without compensation and they are considered to be municipal employees. The BMHC consists of two hospitals, Abraham Jacobi and Nathan B. Van Etten, maintaining ward facilities only, owned and operated by the City of New York and under the jurisdiction of the Department of Hospitals of the City of New York.
Defendant is a nonprofit, medical expense indemnity corporation organized under the Membership Corporations Law, a “ Blue Shield Plan ”. It operates under article IX-C of the Insurance Law ini New York City and 12 surrounding counties. It enters into various types of “ Service Contracts ” with “Contract Holders” by which it agrees, in consideration of premiums paid it, to furnish to the contract holders and to members of their “ Family Groups ” (each contract holder and each member of his family group being described in such contracts as a “ Subscriber ”) medical, surgical and related benefits as specified in “ Surgical-Medical Plan Certificates ” which are part of the service contracts.
The contracts involved in these actions, which are annexed to the respective complaints, provide benefits, inter alla, for surgical and in-hospital medical care rendered by duly licensed physicians. For ¡the purposes of the present litigation these contracts may be' considered as identical although it may be noted that one of the contracts provides a higher schedule of allowances or benefits than do the other two contracts.
Plaintiff Scheinberg is professor of medicine at the College. At the BMHC he is acting chief of the department of medicine and a visiting physician. He sues to recover $88 for in-hospital medical care rendered to defendant’s subscriber Isidore Schmier. Plaintiff Shapira is assistant professor of surgery at the Col *127 lege. He is associate visiting surgeon at the BMHC. He sues for $125 for surgical care rendered to subscriber Coleen Sinnette. Plaintiff Sands on is assistant professor of medicine at the College. At BMHC he is assistant visiting physician. His action is for $90 for in-hospital medical care rendered to subscriber Harry Tobias. All the subscribers were ward patients at the BMHC during the time of the rendition of the services for which recoveries are sought.
Plaintiffs Scheinberg and Shapira are ‘‘ participating physicians ” as that term is defined in paragraph 7 of article I of the service contract, namely, ‘ ‘ any duly licensed physician with whom UMS [defendant] shall have an agreement as set forth in Article XIV hereof.”
Article XIV provides:
‘ ‘ AGREEMENT BETWEEN UMS AND PARTICIPATING PHYSICIANS
‘ ‘ Any Participating Physician who accepts a Subscriber for treatment agrees to render services available under this Contract in accordance with its terms and conditions. He further agrees that payments by UMS shall be in the amounts set forth in the Schedule of Allowances or such other amount and upon such basis as shall be determined from time to time by the Board of Directors of UMS. No physician shall be compelled to accept a Subscriber as a patient and nothing herein is intended to alter or change the normal relation of physician and patient.” (Emphasis supplied.)
Any licensed physician may become a participating physician by signing a form card saying that he agrees “ to render service under terms of the contracts to such United Medical Service, Inc., subscribers as I accept for treatment.” Plaintiffs Scheinberg and Shapira have brought suit on the theory that there is a direct contract between the defendant and each of them as participating physicians.
Plaintiff Sandson’s situation is different. He is not a participating physician. He sues as assignee of subscriber Harry Tobias who, following the rendition of medical services to him at the BMHC, assigned to Dr. Sandson any claim he might have for benefits as subscriber. Reference to nonparticipating physicians is found in article IV of the service contract, entitled “ Payment by UMS — To whom made,” reading in pertinent part as follows: “ If the Practitioner who personally rendered services for which benefits are available hereunder to the Subscriber is not a Participating Physician, such payment shall be made to the Contract Holder if the Practitioner certifies that his fee has been paid; otherwise payment shall be made either *128 to the Practitioner or to the Contract Holder, as UMS in its sole discretion shall determine.”
Other pertinent provisions of the service contract set forth in the complaints* are as follows:
ARTICLE II — BENEFITS PROVIDED TO SUBSCRIBERS
# # *
#3. SERVICE BENEFITS — WHEN PAYMENT BY UMS CONSTITUTES PAYMENT IN FULL OF PARTICIPATING PHYSICIAN’S FEE
(a) If Surgical Care, In-Hospital Medical Care Radiation Therapy, Anesthesia, In-Hospital Medical Care for Disorders of the Mind or Nervous System, In-Hospital Medical Care for Pulmonary Tuberculosis, or In-Hospital Medical Care of the Prema/ture Infant, for which an allowance is payable under this Contract, is rendered by a Participating Physician, he will, subject to the limitations hereinafter set forth, make no additional charge to the Subscriber and payment by UMS in accordance with this Contract shall constitute his full fee if the Contract Holder can show, by evidence satisfactory to UMS, that at the time such care was rendered the sum of his or her income** and that of his or her spouse and unmarried children under 19 years of age, if any, did not exceed
$4,000 in the case of a Contract Holder without spouse or child or children under 19 years of age,
or
$6,000 in the ease of a married Contract Holder, or a Contract Holder without spouse but with child or children under 19 years of age;
provided, the Subscriber notifies the Participating Physician of his eligibility for Service Benefits by claiming Service Benefits on the UMS medical report form filed with respect to the care involved or gives written notice of such eligibility to both UMS and the Participating Physician who rendered the care, within 45 days of UMS’ original disposition of the ease. The Subscriber is urged to notify the Participating Physician, prior to receiving care, that he is a UMS Subscriber and that he is eligible for Service Benefits. In the event of a dispute between a Subscriber and a Participating Physician as to the Subscriber’s eligibility for Service Benefits, the decision of UMS concerning such eligibility shall be final and controlling.
(lb) 'Service Benefits shall not apply when the Subscriber is eligible to receive additional benefits for t!he care involved under a cause of action at law or under another insurance contract providing reimbursement for a Practitioner’s service which duplicates the benefits, or any part thereof, provided under this Contract. However, a Subscriber otherwise entitled to Service Benefits shall not be charged more than the amount available under this Contract and such other contract and action at law for the care involved, or the Participating Physician’s usual fee for such care, whichever is less.
(e) Benefits for Maternity Care, In-Hospital Care, and Electro-Shock Therapy are provided in accordance with this Contract and the Schedule of Allowances but Service Benefits (payment in full) do not apply to those services.
*129 #4. ALLOWANCES FOE CAEE WHEN A SUBSCRIBER IS NOT ENTITLED TO SERVICE BENEFITS.
If Care is rendered by a Participating Physician, the Physician will credit the Subscriber with the full amount of the allowance set forth in the Schedule of Allowances toward his fee.
ARTICLE IV — PAYMENT BY UMS — TO WHOM MADE
If the Practitioner who personally rendered services available hereunder to the Subscriber is a Participating Physician, payment in accordance with this Contract shall be made by UMS to such Participating Physician unless he certifies that his fee has been paid in which event such payment shall be made to the Contract Holder.
[Then follows the provision in Article IV relating to the nonparticipating physician, quoted supra.}
ARTICLE XV — SCHEDULE OF ALLOWANCES
The allowances provided under this Contract shall be the allowances set forth in the Master Schedule of Allowances which is available for inspection at the office of UMS and at the office of the Superintendent of Insurance of the State of New York. UMS reserves the right, in its sole discretion, to determine the amount of allowance, if any, to be paid for Surgical 'Care, Maternity Care, Anesthesiology, or Radiation Therapy for which no allowance is listed in said Master Schedule.
The answers consist of denials and several affirmative defenses. These defenses are basically the same in each action except that as to plaintiff Sands on who is not a participating physician, suing as assignee, there is a special defense. Accordingly, there are now enumerated the defenses in the answer to the Seheinberg case with an explanation of variations therefrom in the other two answers.
The first defense is that plaintiff is not a party or otherwise privy to defendant’s service contract, is not the real party in interest and, accordingly, without standing to maintain the action. This defense is not raised in Sands on. The second defense is that plaintiff’s services were rendered to a ward patient in a municipal hospital and that benefits for such services are excluded under the provisions of article VI of the service contract denying benefits for “ services furnished by a Practitioner under the Laws of the United States of America or any state or political subdivision thereof It is alleged that the services provided defendant’s subscriber at a city hospital were furnished under the laws of the State and City of New York. The third defense sets up that plaintiff is prohibited from charging any fee for his services under section 585 of the New York City Charter, and that under paragraph 1 of article II, of the service contract, “ Benefits of this Plan, but in no event to exceed the fee charged to the Subscriber, shall be provided, subject to the provisions of this Contract.” (Emphasis sup *130 plied.) Since there was to be no charge to the subscriber and he received the care without charge, accordingly he did not become indebted to the plaintiff; so it is alleged that there was no obligation by defendant to pay for such care and there was nothing to indemnify. The fourth defense alleges that “ to the extent, if any, that plaintiff participated in rendering medical care to ” defendant’s subscriber, “ he did so for and on behalf of the Bronx Municipal Hospital Center and not as a physician rendering medical services in private practice to his own patient.” Thus, if any fees or charge were due or owing, it would be due and owing to the BMHC and consequently plaintiff is not the real party in interest and has no standing to sue. This defense, somewhat modified, is the third defense in Sand-son : inasmuch as Dr. Sands on had no right himself to charge a fee, the available benefits under the contract to be no more than the fee charged, accordingly, the subscriber being without expense had no claim against the defendant for assignment to Dr. Sands on. In the fifth defense it is alleged that any claim that plaintiff may have is derived from and through the BMHC and is therefore excluded under article VI of the service contract denying benefits for “ services of Practitioners if fees or charges therefor are claimed by Hospitals, laboratories, or other institutions ”. The sixth defense, also based upon the same provision of article VI, alleges that plaintiff has entered into an agreement with the BMHC not to retain any fees for services rendered to patients therein but to transfer such fees to the BMHC. Moreover, 1 ‘ to effectuate said arrangement it was further agreed that the bookkeeper or other authorized personnel of said Hospital Center should render bills for medical services in plaintiff’s name, receive checks in payment thereof and endorse and deposit the same to the account of said Hospital Center.” The seventh defense alleges an agreement between plaintiff and the BMHC that plaintiff would make no charge for services rendered patients except that plaintiff could bill patients who carry sickness or accident insurance which covered physicians’ fees or who recover damages for cases in tort. In such excepted instances plaintiff agreed to transfer all fees to the BMHC. This defense raises the questions whether the insurance provided by defendant is “ sickness or accident insurance ” within the meaning of subdivision c of section 585 of the New York City Charter, permitting the acceptance of fees for services in New York City Hospitals from patients who carry such insurance, and whether the agreement to transfer the fees received from the defendant to the BMHC is contrary to the public policy expressed in section 6514 of the Education *131 Law and in section 13-d of the Workmen’s Compensation Law. The eighth and final defense in Scheinberg, which is also pleaded in Sandson but is not found in Shapira, is that plaintiff did not “ personally render” the services within the intendment of article IV of the service contract, quoted (supra) and, accordingly, the claim must be rejected.
In Sandson, where the cause of action is based upon an assignment from a subscriber, there is the additional defense that the assignment is void under paragraph 1 of article XIII of the service contract providing that “ The rights of a Subscriber under this Contract are personal to the Subscriber and are not assignable.”
While the court has found it unnecessary in deciding, to pass upon all the contentions raised by the parties, a better understanding, initially, of the cases and their determinative issues will be facilitated by describing the operating details of the medical service and physicians’ and patients’ assignments at the BMHC and the relationship between plaintiffs as members of its visiting staff and its patients.
As noted, plaintiffs are full-time salaried members of the faculty of the College and coincidentally they are members of the visting staff of the BMHC. Although visiting physicians, distinguishable from the general concept, they had no right to admit their own or private patients. Plaintiffs Scheinberg and Sandson were assigned to the medical wards at Abraham Jacobi Hospital while Dr. Shapira was assigned to the pediatric surgical service. There are four medical wards in BMHC, each with 40 beds, each ward usually about 80% occupied, and each manned by a full-time house staff of residents and interns, employees of the hospital and thus of the City of New York.
The assignment of visiting physicians to BMHC’s medical wards for prescribed periods, usually for one month, was made according to a schedule prepared annually by the chief of the department of medicine of the College. These visiting physicians would make rounds on the wards assigned to them generally once a day.
In the Scheinberg action, Isidore Schmier, the subscriber patient, arrived at the emergency ward (admitting room) of the BMHC in late afternoon of January 9, 1961, for a recurrent complaint. He was examined in the emergency room by an intern or resident who then sent him to Ward Four East (4E) of the Jacobi Hospital following an order of rotating assignment among the wards. The intern and resident assigned to Ward 4E began “ definitive treatment ” for Schmier.
*132 Dr. Scheinberg first saw Schmier the following day when making his assigned daily rounds of the ward. He examined Schmier, discussed his findings with the house staff, concurred in their diagnosis and treatment except that he directed that oxygen be given. While Dr. Scheinberg could not recall precisely how many times he had visited Schmier, he probably saw him, four or five times a week on the average. It was his practice to make ward rounds six or seven days a week which would take about two to two and one-half hours daily. “ My goal is to see each patient if only momentarily, every day.” However, twice a week Dr. London, the director of medical service at the hospital, would make rounds on the wards. It was elective on the part of the regularly assigned visiting physician whether or not to accompany Dr. London on these rounds. .
When making rounds, Dr. Scheinberg would be accompanied by the ward intern and resident, four or five third-year medical students assigned to the ward as clinical clerks and, occasionally, by a nurse and a social worker.
Dr. Scheinberg would write his own note on the patient’s chart the first time he saw him. Thereafter, any changes in diagnosis or therapy made by Dr. Scheinberg would be written by the house staff as part of their own notes.
Dr. Scheinberg was in charge of Ward 4E during January, 1961. He was succeeded by Dr. Sandson who was the assigned visiting physician for the ward during February. Patient subscriber Schmier was discharged on February 8, 1961 by the ward intern. Thereafter, Schmier made three or four visits to the outpatient department but Dr. Scheinberg had nothing to do with his care there. During Dr. Sandson’s association with Schmier in the first eight days of February, he made no personal entries in the Schmier record.
The method of treatment and supervision of subscriber Harry Tobias in the Sandson action is similar to that just described in Scheinberg. Tobias, acutely ill, arrived at the admitting or emergency room at 1:50 a.m., on February 5,1961. He was first placed in the overnight ward where he received some treatment, and then he was taken to Ward 4E at 10:00 a.m. Dr. Sandson, who was the visiting physician for this ward during February, 1961, examined Tobias, prescribed a course of treatment which he discussed with the house staff, and saw him on his daily rounds thereafter. Dr. Sandson completed this ward assignment on February 28, to be succeeded as visiting physician by Dr. Gilbert Gordon. Tobias remained a patient until his discharge on Maróh 5.
*133 Dr. Sandson had never seen Tobias until he made his ward rounds and had never raised with Tobias the question of compensation or Tobias’ benefits under his contract with defendant. The relationship between the visiting physician and the ward patient was purely fortuitous, a coincident of the physician’s particular assignment to February service. Eesponsibility for the care and treatment of ward patients was the visiting physician’s.
In a bulletin issued by defendant, it is stated that with respect to hospitalized patients, defendant “pays the attending physician not on the basis of individual visits, but rather on the basis of the length of the entire hospital stay.”
The procedure in the surgical treatment underlying the Shapira action differs from that already described in the other two medical cases. Dr. Shapira, the only surgeon then assigned to the pediatric surgical service, had the responsibility of caring for surgery cases in the pediatric wards. He first saw Coleen Sinnette, infant daughter of a staff colleague (whom he had not previously known), on May 11, 1961 in the pediatric outpatient clinic of the hospital. She was then transferred to a pediatric inpatient ward. She had first been examined by a pediatrician and later examined by Dr. Shapira who recommended immediate surgery for removal of a cyst and the appendix. Dr. Shapira operated for the cyst. The resident who assisted removed the appendix and closed the incision under Dr. Shapira’s direction. He afterwards watched the uneventful postoperative course.
During the fiscal year ending June 30, 1959, defendant paid approximately $100,000 to the plaintiffs and their colleagues on the visiting staff of the BMHC. For 1960 the payments totalled around $75,000. For the year ending June 30, 1962 — with the institution of this litigation in the interim — payments dropped to about $3,000.
Plaintiffs and their colleagues did not personally retain the moneys received from defendant. These were turned over to the medical board fund of the BMHC by the following procedure.
Every member of the visiting staff of the BMHC holding the rank of visiting physician, surgeon or dentist is a voting member of its hospital medical board. So, also, are the directors of certain hospital departments. In 1955 (the first year the BMHC operated), the medical board recommended that all funds collected by visiting staff members from liability and medical care insurance cases, but not fees in workmen’s compensation cases, be contributed to a medical board fund. Such a fund was *134 established and its operation and administration were implemented by a; number of resolutions.
A resolution passed by the medical board on January 4, 1956, provided: “ It is resolved and agreed by all of the members of the Medical Staff of the aforementioned hospital that the monies received by these physicians of the Medical Staff of the Bronx Municipal Hospital Center for such services rendered by them to the patients of the said hospital as hereinbefore stated shall be paid by them into the Bronx Municipal Hospital Center Medical Board Fund to be used for the purposes hereinbefore mentioned and for such other eleemosynary purposes as shall fall within the scope of medical education, research, and for such other purposes which may further enhance the care, treatment and welfare of the patients of the said hospital as well as the furtherance of medical education and knowledge.”
In January, 1957 the rriedical board authorized the employment by the medical board fund of a secretary-bookkeeper whose salary was paid by the fund. This employee was authorized to indorse checks with the names of the visiting staff doctors for deposit in the fund’s account. There is evidence that this bookkeeper and her assistants attend to all the administrative details and, with the exception of the doctor’s signature, they also fill out everything on the defendant’s claim forms, obtaining the information from the patient’s records and charts. Since 1960 no claim would be made if the patient’s chart did not have a handwritten clinical note by the visiting physician.
The medical board fund is used for charitable and educational purposes. It has expended funds inter alla to further the education of residents and interns by financing their attendance at medical conferences; by purchasing medical literature; to pay for the tuition of nurses taking postgraduate courses; to finance a closed-circuit television hookup between the College and the BMHC; and to pay for architect’s fees for a proposed university hospital to be owned and operated by the College.
Plaintiff Shapira testified that it was his understanding that members of the visiting staff were making voluntary contributions to the medical board fund, that the payments belonged to them, but that retention of such compensation would not cause disciplinary or punitive measures to be taken against such doctors.
Defendant’s payments over the years to members of the visiting staff of the BMHC and the establishment of the 'medical board fund to which these members have turned over the moneys so received from defendant have evoked differing, if not countervailing, contentions by the parties. Plaintiffs quote numerous *135 statements in defendant’s bulletins that its service contracts provide benefits for ward patients who are treated in city hospitals. They urge that the payments since 1955 by defendant to plaintiffs and those similarly circumstanced demonstrate defendant’s own practical construction of its service contracts. They say that the practical construction given by the parties to a contract is entitled to great weight and consideration (see Hart v. Hellman Co., 17 A D 2d 438, 444, and cases cited, affd. 13 N Y 2d 633 [May 2, 1963]). Defendants counter that it was not intended to cover the situations herein presented and, in any event, it did not know all the facts and circumstances when it was malting payments in prior years.
Defendant presents a counterthrust in the representations made in 1957 by the medical board fund to obtain a ruling from the Commissioner of Internal Revenue that fees received by these visiting physicians at the BMHC belong to the fund and did not constitute income of the individual doctors and, accordingly, not reportable as part of gross income on their Federal income tax returns. In a letter to the Commissioner written by the fund’s attorneys under date of April 9, 1957, it was stated, inter alia: “ It is the customary procedure that a patient may be treated by several physicians who are on service at that time, and during the patient’s course of hospitalization may then be treated by another group of physicians whose time it has come to rotate their services in the particular medical or surgical specialty. Thus, it becomes almost an impossibility for one physician to be entitled to any of the monies, and hence it becomes a matter of administrative expediency to bill in the name of either the Director of the Service or his designated representative or representatives.
“ By virtue of resolution of the Medical Board herein annexed, none of the funds received for such services rendered by a member of the Medical Staff may be retained by any physician or surgeon for his own use and benefit * * *.
“ There is absolutely no personal relationship of physician and patient since the patient does not voluntarily have the choice of the physician, and in most cases, does not know nor has he ever heard of the physician, but simply becomes a patient of the particular physician by reason of chance.”
In its ruling of October, 1957 declaring that the amounts deposited to the fund’s account need not be included in the gross income of the members of the medical staff who perform these services, the Internal Revenue Service stated, inter alia:
‘1 On the basis of your statement that £ by virtue of resolution of the Medical Board herein annexed, none of the funds *136 received for such services rendered by a member of the Medical Staff may be retained by any physician or surgeon for his own use or benefit it is assumed that every member of the Medical Staff who is entitled to charge for services rendered to patients at the Hospital Centre is required to comply with the terms of the resolution as a condition of his membership.
‘ ‘ Under these circumstances, it is our opinion that members of the Medical Staff supply professional care to the patients at the Hospital Centre as agents of the Hospital Centre.”
While maintaining their satisfaction with this Internal Revenue Service ruling, plaintiffs urge that the ruling should not be determinative in ascertaining their relationship to the BMHC and the medical board fund in the context of the present litigation. They cite cases holding that the same word or term may have different connotations, different meanings in different contexts (see Board v. Hearst Pubs., 322 U. S. 111, 121-122 ; Towne v. Eisner, 245 U. S. 418, 425; Schmidt v. Merchants Desp. Transp. Co., 270 N. Y. 287, 298).
A brief summary of the pertinent statutory provisions governing New York , City hospitals such as the BMHC appears appropriate (see New York City Charter, ch. 23). Section 583-a of said charter provides that the Department of Hospitals shall “ 1. Maintain and operate all hospitals, sanitoria, almshouses or other institutions of the city for the care of sick, injured, aged or infirm persons, except as otherwise provided by law”. The liability of patients to pay for their care and maintenance while! in city hospitals is provided in section 587 as follows:
“ (a). The hospitals or other institutions under the jurisdiction of the department shall be primarily for the care and treatment of the indigent poor of the city and for the protection of the public health, but the department may receive for care and treatment in any hospital or other institution other sick or injured persons and temporarily may receive therein persons alleged to be insane under regulations made by the commissioner.
“ (b). A patient in a hospital or other institution under the jurisdiction of the department who is able to pay, in whole or in part, for care and maintenance, or, if such patient be dependent, a relative legally liable for his support and maintenance, shall be liable for and shall pay to the extent of his ability for such care and maintenance in such hospital or other institution, and the commissioner shall collect and transmit such payments to the treasurer.”
Subdivision c of section 585 of the charter sets forth the conditions under which visiting staff members of city hospitals may *137 charge for their services rendered to ward patients. During the time covered by this litigation, this section read as follows: “ Members of the medical staff who are serving on the in-service of a hospital as part-time clinicians shall serve without compensation for any service in the wards of the hospital, except that they may accept medical fees for services rendered by them to* patients under the provisions of the workmen’s compensation law, or from patients who carry sickness or accident insurance which covers physicians’ fees, or from persons who recover damages from cases in tort, as provided in the regulations made by the commissioner. ’ ’
Prior to the adoption of the 1938 New York City Charter, section 692e of the former Greater New York Charter (Local Laws, 1929, No. 2 of City of New York) had provided that the members of the medical staff of a hospital subject to the jurisdiction of the New York City Department of Hospitals should “ serve without compensation.” Section 692m thereof had provided that patients who were able to pay would “ be liable for his care and maintenance in such hospital * * * and the commissioner shall collect such payment.” In Matter of Kocko v. Harris Coal Co. (262 N. Y. 535) decided in 1933, an injured workmen’s compensation claimant was treated at Bellevue Hospital, a city institution. The hospital rendered a bill for $161, made up of four items for care and maintenance aggregating $86, and a charge of $75 for an operation performed on the claimant. The Court of Appeals, reversing a determination that there was no authority for the hospital’s charge for the operation (apparently on the ground that services of the surgeons were rendered without charge to the hospital), held that the full hospital bill was a proper charge against the employer.
Subdivision c of section 585 of the 1938 New York City Charter specifically provided that physicians could charge fees for their services in workmen’s compensation cases. (See Tanzer, New York City Charter, p. 513, where it is stated: “ The compensation insurance companies are bound to pay fees for the medical services given these patients, and it was felt by the medical profession that these fees should be given the treating physi *138 clans.”) In 1943 (Local Laws, 1943, No. 49), this section was amended so as to permit the physicians to accept fees for services ‘1 from patients who carry sickness or accident insurance which covers physicians’ fees, or from persons who recover damages from cases in tort ’ ’.
Plaintiffs assert that the foregoing history of subdivision c of section 585 shows a legislative intention that visiting physicians rendering services to ward patients in this city’s hospitals may charge for their services where the patients carry insurance covering physicians’ fees. Defendant, on the other hand contends that the services to patients in such hospitals are furnished under the laws of the City of New York and in any event, the insurance it provides is not “ sickness or accident insurance ” as those words are used in subdivision c of section 585. It analogizes the instant situation with that where neither a war veteran nor the Federal Government can recover any insurance for the treatment of the former at a veterans’ hospital (United States v. St. Paul Mercury Ind. Co., 238 F. 2d 594; Drearr v. Connecticut Gen. Life Ins. Co., 119 So. 2d 149 [La. Ct. of App.]; cf. Theriot v. Schlumberger Well Surveying Cory., 131 So. 2d 94 [La. Ct. of App.]; Gordon v. Fidelity & Cas. Co. of N.Y., 238 S. C. 438).
While the court has stated at length the pertinent facts and the numerous contentions advanced by the parties, it has based its decision in the accompanying findings and conclusions upon a fundamental ground without the necessity for reaching the other issues. Ntir has it considered the varying equities advanced by the parties. The over-all determinative issue here is the construction of defendant’s service contract — the ascertainment of scope of its coverage and of its exclusions as a matter of intention. In the opinion of the court the payment of benefits by defendant is a matter of indemnification, of reimbursement which contemplates the existence of the personal, intimate relationship between patient and physician. It is that kind of relationship involving from inception confidence as the basis for privileged communication. Such relationship as a sine qua non of recovery is singularly lacking in all of these cases. These subscribers did not choose any of the plaintiffs as their doctors. ;Plaintiffs were assigned to the subscribers and the selection of a doctor for a particular subscriber was a matter of chance. No thought was given on either side to compensation, nor was anything said of it in the beginning. Identity of doctor was immaterial, compensation afterthought.
Insofar as plaintiffs Scheinberg and Sandson are concerned, the court finds and holds that they did not “ personally render *139 services ’ ’ to the subscriber within the meaning and intendment of articles IV and VII of the service contract. Once the month’s assignment to the particular ward was over, there was no longer responsibility for, nor special interest in the patient who remained in the ward to see him better except perhaps as a matter of purely of scientific interest. While the ease of plaintiff Shapira, the only surgeon then assigned to the pediatric surgical service, differs in degree from those of the other plaintiffs, the overriding legal principles affect him in the same manner as the others.
Plaintiffs’ statement quoted above, treated as an admission, made to the Commissioner of Internal Revenue in April, 1957, bears reiteration: “ There is absolutely no personal relationship of physician and patient since the patient does not voluntarily have the choice of the physician, and in most cases, does not know nor has he ever heard of the physician, but simply becomes a patient of the particular physician by reason of chance.”
Viewed alternatively, the medical expense indemnification in contemplation in these service contracts is intended to reimburse for a medical cost obligation actually incurred (Insurance Law, § 250; UMS contract, art. 11[1]). Patients Schmier, Tobias and Sinnette incurred no fee obligation to the respective plaintiffs. There was no choice nor request for any of them; neither was there contemplation of payment to them.
The court is acutely conscious of the high quality of medical service afforded the ward patients at the BMHO by plaintiffs and their colleagues on the visiting staff. It recognizes the extremely worthwhile purposes and accomplishments of the medical board fund. At the same time it is cognizant of the nonprofit nature of defendant’s operations and of the fact that its rates to its millions of subscribers have been going up. The difficulty presented by these cases is an economic one, the solution of which should concern the other branches of our Government. As a matter of construction based upon the facts there is no right to recovery here. These doctors have no right to collect from this defendant for services outside the usual doctor-patient relationship.

 The provisions in the text are taken from the Shapira complaint but mutatis mutandis are applicable to the companion eases.

 (Income shall mean money, property, or value of any kind, received during the twelve months immediately preceding the date care is rendered, including, without limiting the foregoing, salary, wages, business profits, interest, dividends, royalty and capital gains).

 Subdivision e of section 585 was amended by Local Law of the City of New York, No. 21 of 1962, effective May 9, 1962, so that it now provides as follows: “Physicians serving in a hospital who serve without compensation shall be authorized to charge medical fees for services rendered hy them to patients under the provisions of the workmen’s compensation law, or to patients who carry sickness or accident insurance which covers physicians’ fees, or to patients who recover damages from eases in tort, as provided in the regulations made by the commissioner.” (See: The City Record, vol. xe, No. 26991, May 18, 1962, p. 3571.)